HOUSTON BELT & TERMINAL RY. CO. v. STEPHENS.

(Court of Civil Appeals of Texas. El Paso. Feb. 27, 1913. Rehearing Pending and Certified Question to Supreme Court Granted April 17, 1913.)

1. MASTER AND SERVANT (§ 153*)—INJURIES TO SERVANT—DUTY TO WARN.

An infant, acting as a car checker for a railroad company, should be warned of the danger of riding on trains if he is expected to do so, or his duties require it, but, if it is not required, he is a mere licensee when riding on trains and takes them with all defects.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 314–317; Dec. Dig. § 153.*]

2. MASTER AND SERVANT (§ 89*)—INJURIES TO SERVANT—EVIDENCE.

Even though a car checker in a railroad yard rode moving trains in the performance of his duties with the knowledge and tacit consent of his superiors, and this course of conduct was practically necessary to expedite the performance of his duties, yet, when he rode a train after he had finished his duties solely to get to the place where he could put away his check book, he was a mere licensee; the implied invitation not extending that far.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 153–156; Dec. Dig. § 89.*]

3. EVIDENCE (§ 472*)—OPINION EVIDENCE—ADMISSIBILITY.

In a personal injury action by a car checker, who contended that he was required to ride trains in the performance of his duties, and was hurt while boarding a moving train, testimony that he thought it was his duty to ride cars is properly excluded, because tending to substitute the opinion of the witness for the finding of the jury.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2186–2195, 2248; Dec. Dig. § 472.*]

4. MASTER AND SERVANT (§ 267*)—INJURIES TO SERVANT—QUESTIONS FOR JURY.

In a personal injury action by a car checker hurt in boarding a freight train on which he wished to ride to the office after finishing his duties, where he contended that he was required to ride trains, the question for determination was whether he was acting in the line of his duties as he saw it and so the jury should consider the action of the agents of the company in consenting to plaintiff's riding trains, and take into consideration his age and experience.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 909, 911; Dec. Dig. § 267.*]

5. MASTER AND SERVANT (§ 264*)—PLEADING—ISSUES.

In a personal injury action by a car checker injured while boarding a moving freight train, the defendant, having pleaded that the train belonged to it, cannot at trial defend on the ground that it belonged to another railroad company over which it had no control.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 861–876; Dec. Dig. § 264.*]

Higgins, J., dissenting.

Appeal from District Court, Harris County; Wm. Masterson, Judge.

Action by Joe K. Stephens against the Houston Belt & Terminal Railway Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

Andrews, Ball & Streetman, A. L. Jackson, McDonald Meachum, and John M. King, all of Houston, for appellant. John Lovejoy and J. W. Parker, both of Houston, for appellee.

HARPER, C. J. This suit was brought by plaintiff, Joe K. Stephens, to recover damages for personal injuries alleged to have been inflicted upon him while in the service of the defendant railway company as car checker, on or about September 29, 1908.

Plaintiff alleged "that at the time of his injury he was a minor, without any lawful guardian of his person or estate, and that on

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

September 29, 1908, he was 18 years of age, and was then and there employed by appellant as one of its car checkers in its yards in and near Houston, Harris county, Tex.; that it was the duty of the car checkers to enter the numbers and initials and the seal numbers of cars received by appellant upon its railway in said yards in a book provided by appellant for that purpose; that, in the performance of said duties, it was required of car checkers to go into the yards of appellant and ride and hang upon cars moving therein and between the same, and that it was usual and customary for them to do that, as well as for divers others of appellant's employés performing duties in such yards, which custom was well known to appellant, or would have been, by the use of ordinary care, and appellant acquiesced therein; that appellant's yardmaster or yard foreman, who was thereto duly authorized, directed, required, and permitted appellee to ride cars moving in its said yard and between yards in the performance of his duty under the circumstances he was when injured; that appellee, being so directed, required, and permitted, and seeing other car checkers and other of appellant's employés riding upon cars in said yards in the performance of such duties, believed it was proper and right for him to ride thereon, and that, after checking certain cars in the said 'old yard,' he undertook to get on a caboose attached to a string of cars which was moving in the direction of the depot on Preston street for the purpose of riding thereon to the depot where he was to leave the book in which he had entered the numbers, etc., of said cars, as was his duty to do, and as he was undertaking to get on said caboose, or just after he had gotten on the step thereof, he came in contact with an upright switch stand, which knocked him down, and caused the wheels of the caboose to run over his right foot and injure the same so that it had to be, and was thereafter, amputated about two inches above the ankle; that appellee, when he entered the service of appellant, and at the time of his injury, was not only a minor, but was inexperienced in the work of checking cars and of the manner of doing it, and was ignorant of the dangers attending such work, and appellant and those of its agents intrusted with the duty of employing appellee and in directing him in his work knew, or in the exercise of ordinary care would have known, of his minority, inexperience, and ignorance, and would, in the exercise of such care, have foreseen that he would probably ride and hang on the moving cars in said yards in the performance of his duty, and so knowing they carelessly and negligently failed to instruct him in the performance of his duty as car checker, and failed to warn him not to ride or hang onto the cars, and failed to warn him of the danger to which he would be exposed when getting on

or riding on cars passing the said switch stand; and appellee alleges that said switch stand was maintained in such proximity to its railway as to be a menace to the lives and limbs of those of its employés whose duties required them to get on and ride on cars passing said switch stand under the circumstances appellee was doing when injured. Appellant's answer consisted of : (a) General demurrer; (b) general denial; (c) specially denying that it was any part of appellee's duty, in the service of appellant, to get upon said caboose while the same was in motion, and on the occasion of his alleged injury, and that said act upon the part of appellee was not necessary or incident to the performance of any duty he owed to appellant as car checker, and that said act of appellee in getting upon said caboose, under the circumstances, was without authority from appellant, etc.; (d) assumed risk; (e) contributory negligence; (f) unavoidable accident." Judgment for plaintiff.

First assignment of error complains of the court's refusal to give a peremptory charge for the defendant, because the undisputed evidence shows that appellee, when the accident occurred, was a trespasser or licensee, because he had no duty to perform as car checker in connection with the train or caboose from which he was knocked by the switch stand, but that he voluntarily, and without any necessity growing out of his work as car checker, but for his own convenience, got upon said moving caboose, and that the evidence fails to show that the appellant had failed to perform any duty which it owed appellee as a trespasser or licensee. The question is, Was the plaintiff, under the facts of this case, a licensee or a trespasser in taking the position he did upon the train from which he was knocked by the switch stand?

[1] If the plaintiff was required or expected to ride upon the freight train, or that his duties required him to ride thereon, then he would have been acting within the line of his duties, and, being a minor, it would have been the duty of the company, if it would avoid liability for accidental injury to him, to warn him of the dangers attendant thereon; but, if he was not, then there was no duty devolving upon the company, and plaintiff was a mere licensee, and as such the law is he takes the premises as he finds them. Lynch v. T. & P. Ry. Co., 133 S. W. 522; St. Louis S. W. Ry. Co. v. Spivey, 97 Tex. 143, 76 S. W. 748.

[2] The whole of the evidence bearing upon the aforesaid proposition adduced upon the trial is as follows: Plaintiff testified: "Chief Clerk Hope employed me to work as car checker. The way I did the work was: I had a book called a seal record, and when a train came in I would go out and get the seals; some were numbers and some letters; some were on the side door and some on the

end door; when I got them I wrote them in the book. The yard was about two miles long, and my duties required me to check cars throughout the yard. There were about 18 or 20 trains a day, and I would go out and check a train whenever the chief clerk told me to, and take the book back to the office. To get from the old yard to the south yard or yard 49, I would have to ride; did not have any particular engine or train, but would ride any that came to hand. If the cars in any train I was checking were moved, I would ride them to wherever they stopped. I would get on the side, on the top, on the handle bars. I have done that often. And after I got through checking a train, if there was an engine or train going toward the depot, I would ride it. The yardmaster's name was Mayfield. I saw him often. He was where he could see me; we were both working in the same place; he has told me to ride cars. The chief clerk nor the yardmaster ever told me not to ride the cars, and my idea was I had to do it or I couldn't do the work. I had just finished checking a train and was going back to the depot; did not have to check any more that night; my work wasn't finished; I had to take the seal book to the office; when I finished, I was about two blocks south of the depot. That train that was passing, that I was injured by, was a north-bound freight train; it was not my duty to check any cars in this train, and did not intend to do so. I just got on it to ride to the depot to put my seal book up, and then I would be off for the night. It was customary for any of the employés to ride if they wanted to go to any part of the yards. I rode the cars because you can do your work quicker. If the train I was checking moved, I would get on and go with it. As to whether it is a fact that I testified in a former trial of the case that the only time I was authorized to ride trains was when I was going to or coming from the south yard, or when I was checking a train and they moved that train before I had finished that checking, that might be the only time I was authorized to, that was the only time he told me to ride. I was never told to ride any trains after I had finished my work for the purpose of putting up my book. Nobody ever told me not to do it."

C. E. Mayfield, yardmaster: "I had authority to forbid any practice of the people employed in the yards that I saw proper and that applied to car checkers. I don't believe I did tell Joe Stephens not to ride trains after he had gotten through checking in order to deliver his book. I never gave any instructions to car checkers to get on moving trains to ride to the office. Within my knowledge, while I was yardmaster, it was not the practice or custom for car checkers, after finishing their work, to get on moving trains or cars and ride to the office to leave their books, and I don't remember seeing them do it. He had no business on the cars when they were switching them up and down."

The undisputed evidence is that, upon the occasion of the injury, he was required to check the train of cars that had arrived in the yard at about 7 o'clock p. m., and that, while engaged in this work, he was joined by Clifford Joplin, another car checker; just about the time they had finished checking this train of cars and were ready to return to the office in order to put up the seal book, a through Trinity & Brazos Valley freight train came along, headed toward the depot, where appellee intended to go in order to put up the seal record. The depot was about 2½ or 3 blocks away, and both the boys attempted to ride the train to the depot. Joplin succeeded in getting safely upon the caboose, but appellee, when he had stepped upon the steps of the caboose, came in contact with a switch stand and was knocked from the caboose and the rear truck ran over his foot, which was afterwards amputated. Appellee admits that he had nothing to do, as car checker, with this train. It was a through train which did not stop, a Trinity & Brazos Valley freight, so, if he was in the line of his duty, it was because his duty required him to return the seal record to the office and to ride this train in doing so.

The evidence is silent as to any business relation between the appellant and Trinity & Brazos Valley Railway Company. If, then, it be conceded that appellee was justified in believing it to be his duty to ride the trains in checking the cars, it does not follow that he was in the line of his duty in jumping upon a moving train with which he had no duty to perform. The appellee does not charge, nor is there any evidence, that the appellant, through any of its agents, promulgated any rule or gave appellee any instructions to the effect that he should ride any train or switch engine, and, if he had the right to ride the trains and cars at any time, it was not because he was required to do so, but because, under all the facts, a reasonably prudent person would have concluded that his employer expected him to do so to expedite the work in hand; and this, if based upon anything, was because the plaintiff and other employés of the appellant habitually rode on freight trains and engines from one part of the yard to another, and that such course of conduct was known to the officers and agents of the railway company; but this would only authorize him at most to ride the trains and engines in the discharge of his duties as car checker, and, when he attempted to swing upon the train with which he had no business connection, he was beyond any invitation extended to him and became a trespasser, and as such he took the yards as he found them. St. Louis S. W. Railway Co. v. Spivey, 97 Tex. 143, 76 S. W. 748.

[3] Second and third assignments of error complain that the court erred in permitting

plaintiff, testifying in his own behalf, to testify, over the objection of defendant, that it was his duty, and that he believed it to be his duty, to ride cars in the performance of his duties as car checker. This was the very question at issue in this case whether it was the duty of plaintiff to ride the cars, or whether he was a licensee or trespasser when he rode the car in question, and it was for the jury to determine from all the facts and circumstances, and not a question upon which the witness could express an opinion. Railway Co. v. McSwain, 55 Tex. Civ. App. 317, 118 S. W. 874.

[4] Fourth and fifth assignments of error complain of the following charge of the court: Fourth assignment of error: "The court erred in that portion of its general charge to the jury which reads as follows: 'Now, therefore, if you believe from a preponderance of the evidence that Joe K. Stephens, the plaintiff, was in the employ of the defendant as a car checker, and that it was his duty to enter in a book, provided by defendant for that purpose, the numbers and initials and the seal numbers of the cars received by defendant in its yards in and near the city of Houston, Tex., and believe defendant expected plaintiff and its other car checkers to ride cars which might be passing when going to or returning from their work in the yard, then it was the duty of the defendant to use ordinary care to furnish plaintiff and its other car checkers a yard that was reasonably safe for performing the work in the manner expected of them; and if you believe from a preponderance of the evidence that the plaintiff, in the performance of his duty, took the seal numbers of certain cars in defendant's yards in this city, and that after doing that he got on the steps of a caboose attached to a train that was then passing, to ride thereon to the depot, for the purpose of leaving the book in which the seal numbers had been entered, and believe that in so doing he was performing his duty in the manner expected of him by the defendant under the circumstances, and believe that, after he had got on the said step, he came in contact with an upright switch stand, and was thereby knocked down and his right foot run over by the wheels of the caboose and injured at the time and place and in the manner substantially alleged in his petition, and you further believe, from a preponderance of the evidence, that the said switch was maintained in such proximity to the track on which the said caboose was moving as to be a menace to the safety of defendant's car checkers in the performance of their duty in the manner they were expected to perform it, and you believe that defendant, in so maintaining the said switch stand, if it did that, should have foreseen that plaintiff or some other car checker would, in the performance of his duty, in the manner expected of him, be injured by coming in contact with the said switch stand, while riding upon

cars passing the same under circumstances similar to those under which the plaintiff was injured, and was guilty of negligence, and believe that such negligence was the proximate cause of the injury of plaintiff, and you do not believe plaintiff himself was guilty of contributory negligence or assumed the risk of injury, you will return a verdict for the plaintiff and assess his damages according to the rule hereinafter given you, but, unless you so find, you will return a verdict for the defendant.'" Fifth assignment of error: "The court erred in that portion of its general charge which reads as follows: 'Or, on the other hand, if you do not believe, from a preponderance of the evidence, that the plaintiff was injured at the time and place and in the manner substantially as alleged by him in his petition, you will, without inquiring further, return a verdict for defendant; or, if you do not believe that plaintiff undertook to get on the caboose, and was injured after he had gotten on the step thereof by coming in contact with the switch stand, or if you believe he was thus injured, but yet do not believe that the plaintiff was expected, in the performance of his duties, to ride on the car under the circumstances, or if you believe that plaintiff attempted to get on the caboose step, and in so doing ran against the switch stand and was thereby caused to fall and be injured, or if you believe plaintiff's injury was due to dangers and risks and conditions which were ordinarily incident to his service, or if you do not believe the injury of plaintiff or some other car checker, under like circumstances, in view of the way plaintiff was expected to perform the services, was one which should have been foreseen as likely to occur under the circumstances, you will, in either, any or all of such cases, likewise return a verdict for defendant.'"

The question is, Was plaintiff acting within the line of his duties in riding upon the train where he was hurt, in returning to the office to deliver his seal record, or whether he was a licensee or trespasser, and he may have been doing that which the company's agents expected him to do, and yet not be in line of his duties in riding a train or car?

All matters, such as did his employers require him to ride the trains to and from the yards, or were the facts and circumstances sufficient to lead plaintiff to believe that they required or expected him to ride, or that the facts and circumstances indicated that the duties themselves required him to ride the trains with or without instructions, always taking into consideration the age and experience of the plaintiff, are proper matters for the jury to consider in determining whether the plaintiff was acting in the line of his duties as he saw it. The actions of the agents of the defendant company, or their failure to act, must have the effect of impressing the plaintiff with the fact that he had more than the tacit consent of de-

fendant. They must be sufficient to enable the jury to determine affirmatively that he rode the cars in the performance of his duties as his employer expected him to do them, and the charge of the court should be confined to the question, Was plaintiff acting within the line of his duties as car checker in riding the train from which he was knocked and hurt, from his (plaintiff's) viewpoint? and not what may have been expected of him by the employés of the railway company, as conveyed by this charge, whether the plaintiff knew of such expectation or not.

The seventh assignment presents no error. The expression of opinion complained of was by an expert who was qualified to express it.

[5] The eighth assignment is disposed of by what has been said. And the ninth assignment, which raises the question that the plaintiff was riding on a Trinity & Brazos Valley train, over which defendant had no control, and therefore was not in line of his duty, cannot be considered because defendant has not pleaded it, and, on the other hand, has pleaded that "the train upon which plaintiff was riding at the time he was hurt was the train of defendant railway company."

In view of the testimony, we are of the opinion that the court did not err in refusing special charge requested by appellee, as complained of by appellee's cross-assignment of error.

Reversed and remanded.

HIGGINS, J. (dissenting). The majority opinion sustains the first assignment of error, holding that a peremptory instruction in defendant's favor should have been given. This holding is upon the theory that, in attempting to board the train from which plaintiff was thrown by coming in contact with a switch stand, he was a trespasser, or at best a mere licensee.

Believing the statement of the evidence made in the majority opinion is not as complete as it should be, the following statement thereof is therefore made: Plaintiff in his own behalf testified: "I worked for the Houston Belt & Terminal Company; I began to work for that company on September 29, 1908, in the yards at Houston in the capacity of car checker. Chief Clerk Hope employed me. I went down there and asked him for a job, and he said, 'Yes, there is a place open for a car checker;' and he asked me did I know how to do that, and I told him I had never done that kind of work, and he said I would do all right, and he put me to work. The only instructions he gave me was about what I would have to do each day, just the kind of work I would have to do checking cars, and things like that. I worked there one month, up to the time of my injury. During that month I was checking cars. Every train that would come in; while there, I was checking cars. How I would do that work (that is, what I mean by checking cars) I had a book called a seal record, and when a train came in I would have to go out and take the seals off the side doors, see what they were, some were numbers and some were just letters; then the little end doors, I would have to take them, too, and write them in the seal record, put them down in the seal record; I would do that work whenever a train would come into the yard. The yard was about two miles long, I guess; I don't know where the limits are; but the main tracks across are about two miles; there were two yards. Well, there is one they call the 'new yard'; then an old yard and the 49 was the south yard; I guess there would be three yards if you count those separately. Those yards were named by 49 and the old yard. The old yard was right along where the Santa Fé freight depot used to be; the first tracks before they built this new part down there; that was inside the corporate limits of Houston. The 49 yard was about 3 miles or 3½ miles below the old yard. The dimensions of the old yard, the one in the city, the length of the yard, it was a mile and a half across, or two miles, and the width is— It has about seven or eight tracks, I suppose. In the old yard in the city here, I think there is seven or eight tracks, maybe ten; I am not certain how many; there was four in the 49 yard then, I believe; I am not sure. My duties required me to check cars in both of these yards. The trains that I would check in the old yard would generally be on the side track, on either side of the main line; they were on different tracks; they would pull in on any, most, that was open. I didn't have a particular place where I checked every train. The way I would find out when I had to check a train, the chief clerk would tell me. I would have to check about 15 or 18 or 20 trains a day, maybe 15 or 18. Assuming that a train has come into the old yard, the one in the city, and that I have been directed by the chief clerk to take the seal numbers, to check it, the way I would proceed: The chief clerk would tell me, whenever a train would come in, that I would have to go out and check it, and I had a book there that we called a seal record, and I would go out where this train was (it would be on one of the side tracks), and I would start at one end and take the side seals and put them down in the book, then I would go in between and get the end seals, and after finishing that side, I would walk on the other side and take them the same way as the other side, then take the seal record back to the office. The seal record was kept in the chief clerk's office. It would be on his desk when he would tell me to check a train, or in one of the pigeonholes. I would then get the record and go out into the yard. After I finished checking I would take it back to the chief clerk's office. The seal record would be in my possession only the times when I was checking trains. The office

in which the seal record was kept was in the old freight depot, right on Preston by the passenger depot. The trains that I would have to check would be located; they would be on different tracks, in different parts. This depot, where the seal record was kept, with reference to these seven or eight or ten tracks that I have mentioned as being in the yard, the old yard, is at the north end of the tracks. With reference to the depot, some of the tracks was a good piece away, then others would run up right to it. The closest track to the depot was the main line. I don't know the numbers [meaning the tracks]; I didn't know they were numbered. The yard was crooked; there is a curve in the yard; most of them are straight on the other side; some straight ones on the other side. The furthest one of these tracks is about a half a mile, I suppose, from this depot at the south end; but crosswise it was about a block or something like that; and they ran from the main line across to this track furthest away, and that distance was about a block. Sometimes I would have to go to the south end of the old yard in getting to a train that I had to check in this old yard, and that would be, I suppose, about three-quarters of a mile or a mile. I would be called upon to check cars between that distance all the way back to the station, and I did that daily. In checking cars in yard 49, one way I would check them there, every morning in the old yard; I would have to check every morning; I would have to check that every morning, take the numbers and initials of all cars in the yard every morning; that had to be done every morning; that was in addition to the work of checking the trains; then, at the south yard, all I would do down there was I would check the whole yard. To get from the old yard to the south yard, or yard 49, I would have to ride—ride a switch engine going down, or other trains that stopped there—and I would get back the same way; I would have to ride. I did not have any particular train or particular engine that I would ride in going to and from this yard; I would take any that came to hand. In doing my work in the old yard, the one in the city here, the way I would get about in the yard, I would, if I was checking a train, going out or in, I would know where the train was before I left; he [meaning the yardmaster] would tell me where it was; then I would walk out and check it as much as I could. It had occurred that before I finished checking the train that the cars in it would be moved; that happened every once in a while; in that case, about the work, I would have to get on them wherever they took the cars. I would get on the side or the top; I generally got on right where I checked, right where I would be checking; I would hang on the side, on the handlebars at the side and the end of the car, that ran by the side of the car; and, if the car was moved, I would catch onto it and ride it un-

til it came to a stop; then I would start checking again; I would go on with my checking; I done that often; I had to do that because they moved them [meaning the train] often. When I would be going to check a train that was some distance away, and the engine or car or train happened to be moving in that direction, my practice was I would ride if there was one coming that way. Now, after I would get through with my work, and the engine, or engine and car, or train, was passing in the direction of the depot, where I would have to leave my seal record, I would ride if there was one that was going that way; I done that every time, maybe two times a day; any time they came by I would do that; I did that often, both in going to my work and returning.

"The yardmaster's name was Mayfield; Charley Mayfield, I believe. I saw him in the yard; he was in the yard all the time. The yardmaster had charge of the yard there; this man Mayfield. He was where he could see me; he was up and down in the yard all the time. My duties required me to work there in the yard, and his [the yardmaster's] duties required him to work there in the yard; he was working right at the same place I was. He was where I could see him during the day. I was right there working where he would be passing at all times of the day, and I could see him; he would be passing right by me; I was close enough to speak to him; I was close enough to him to touch him; that was often; that was a daily occurrence to be close to him; we were both working there in the same place. Not when I saw him would there be any obstructions between me and him; he would be right along by me. I have talked with him. He didn't have so much to do about telling me about performing my duties, only going to 49 and doing my work; of course, if I didn't do my work, he would have to tell me. They have told me to ride cars in the yard there; the yardmaster did that; I mean Mr. Mayfield. These trains that would come into the yard that I would have to check, there would be the engineer and fireman and the conductor and maybe two brakemen composing the crew; I would see these men. I saw them getting on and off cars moving through the yard there all the time. I think there was four switch engines employed there in the yard then. The engineer and fireman and the foreman of the engine and three helpers composed the switch crew, and each engine had that number of men in its crew; those men were under my observation all the time. I have seen them get on and off cars moving in the yard there, moving on the same tracks that I mentioned, and moving on these tracks on which I checked the trains; it was a frequent occurrence to see these men getting on a and off moving cars in the yard there; it happened all the time. With reference to riding or not riding cars, they never told me not to ride

them; the yardmaster just told me to ride, and the chief clerk told me to do work where I would have to ride, and where I did ride, and neither of them never told me not to ride cars. In riding cars my idea was it was my duty; I would have to do it, or I couldn't do the work. My work was done in the day; I worked days; I would go on duty at 7 in the morning and was supposed to go off duty at 6. I had never worked as a car checker for any other company. The work I did there in the yard was the first work I ever did as a car checker. Nobody, I guess, had ever told me what were the duties of a car checker other than as I have stated; they had not told me; nobody had undertaken to tell me what were the duties of a car checker other than as I have told here. Only the time I got hurt did any accident befall me while I was working there as car checker; that very day, that very time. That was October 29, 1908; I had been working there then just one month. To tell the jury in my own language how that accident happened, well, on the 29th of October, 1908, the chief clerk, Parsons, sent me out to check a train that had just come in from the south; I think it was a B. & M. train; I think there was about 30 cars in this train, and it was on the side track just below the freight depot, the old yard, which is on that side of the main line, and I went out there; it was about 7, I guess, or 7:30 at night, getting just getting dark, and I didn't have any lantern; they didn't furnish me any. On the way down I found Clifford Joplin, who was a car checker, in the yard, and he said he would go with me; he had a lantern, and we started; we went down on the other side, the east side, I guess of this train, and he was going up and getting the seals with the lantern and seeing what they were; he would go in between the cars and get the end seals, then the side seals, and he would bring the lantern back and I would put them down in the book; that we went up on the east side, and we were turning to come down on the other side and was getting the seals on that side, and we were just finishing up when a train come up pulling very slow; it was about 8 o'clock, I suppose, and we were supposed to get off at 6, and we got on this train to go back to the depot; he had just got on, and I had got on and rode about 10 or 12 feet when I got hit in the side by a switch stand and it knocked me off; my right foot went under the truck of the caboose, and this boy, when he saw what happened, he got off [meaning Clifford Joplin], and he seen that I was hurt, and he flagged a switch engine that was coming right in behind that train, and they put me in the cab of the engine and took me to the St. Joseph's Infirmary, and they amputated my leg, my foot; they cut it off about two inches above the ankle. The train that I got on was going north. I undertook to get on the other side, the east side, I guess it is. On the other side of the depot would be on the east side. It was a caboose that I undertook to mount; I didn't know at that time what kind of a caboose it was; it had a side step on it; that ran in right along the side door; there was one door on each side of the caboose; the caboose had side doors, one of those kind that had side doors. Underneath the door there was a board, I guess about 12 inches wide (I don't know about that), and about seven or eight feet long; this board was there as a step to be used in entering the door of the caboose. I think the caboose door was closed, most of it anyhow; it was the step that I undertook to get on, this board or step; my object in getting on it was to go to the depot to put the seal record and the lantern up to go home. Joplin had got on just before I did; he got on ahead of me. I did not know that that switch stand, recall that that switch stand was there when I undertook to get on; there was no telling whether it was close or not; it was dark; there was no lantern on it; it was not lit if it was. I say I didn't know it was there when I went to get on. It must have been an upright switch stand that struck me; it hit me on the side right here; it struck me on the side, right along here. [He stands up and indicates.] I had a watch here and it hit the bottom of the watch. I know I was struck by the switch stand; I did not know that it was close enough to the track to strike me. I had never learned at any time while I was at work there in the yard that that switch stand was close enough to strike a man riding on the footboard, or undertaking to get on it when passing; I never heard anybody say; nobody never told me this switch stand was too close, and I didn't know it was too close for anybody to be hit by it. Now, when I undertook to get on this board, and while I was on it, as to whether I did or not consider that I was in the performance of my duty as a car checker, well, I thought it was part of my duty to go from any part of the yard to the office, and from any part of the (I mean from the office to other parts of the yard) to ride on the train.

"I say I was 18 years old when I entered the service of the defendant company. My appearance then as to being a boy or otherwise, I was young looking for my age at that time; I weighed at that time about 118 or 119; my face was smooth; I suppose I have grown four or five inches since then; I was small for my size at that time. At that time boys were employed in the service of car checking. At the time I was employed there was one car checker that worked in the same part of the yard I did, and there was a transfer clerk; Clifford Joplin was the name of the one who worked in the yard with me; he was a boy about my age; he was with me on the night of the injury. In doing his work he would ride the cars under the circumstances I would. They called that switch the old roundhouse switch.

I was never told by anybody that, if I undertook to ride a car under the circumstances I was doing on the night I was injured by that switch stand, I would be in danger of being knocked off by it; nobody ever told me it was too close; I did not know I would be. * * * When I would go to the south yard I would go on a switch engine or whatever was going down. While I was checking cars in the Congress street yard, if they were moving, why I had to get on; if they were moving, I got on them and went with them; I had to get on them or lose trace of them when the switch engine took the cars away; in other words, if I had not finished checking, if checking a train when it was moved, I would have to go with it to finish checking it; that is the purpose I got on the train for. * * * This train that I was checking was south of the freight depot on the side track east of the main line; about two or three blocks south from the freight depot. I don't know exactly about how many cars there were in that train; I suppose about 30. The train was not moving at any time I was checking the cars there, that train. I stated that on my way down I met Clifford Joplin, and he went down there with me. I don't know how long it took me to check the cars in that train, about 30 or 40, something like that, minutes, maybe an hour; I am not certain. I had just finished checking the cars in that train when I had started back to the depot; when I finished, I was ready to go back to the depot. I didn't have to check any more that night; my work of checking was finished for the night; that was the last train I would have to check; my work wasn't finished, I had to take the seal record and put it in the office before I left; they had to stay in the office all the time because they done their work by that, by the seal record, by that book, I mean. When I finished checking this train, I was two or three blocks then south of the depot. This train, that was passing that I was injured by, at the time I was injured, was a north-bound freight train; I don't know what it was; that train was pulling through the yard going north; it was not a string of cars with a switch engine, or anything like that; it was a freight train; and it was not my duty, or I didn't intend at that time, to check any cars in that train, and I hadn't checked any cars in that train. I had just got on the side of that train; I made an effort to ride back to the freight depot to put this seal record up; and this other boy had to put his lantern up, and we would be off. The reason I attempted to get on this train instead of walking down to the depot, it is customary for all employés in the yard to ride if they want to go to any part of the yard there; if they go out of the yard, they get on the train and go out. As to its being a fact that I just decided it would be a little more convenient to go back that way, and for that reason I got on that train, it was customary; that was my understanding; I say it was customary for them to ride if going back to the depot, and you can do your work quicker. As to whether it is a fact that I attempted to get on the train because it was more convenient for me to do it than to walk, well, you can do your work quicker; it is just as easy to do your work that way; you can do your work quicker. As to whether that is the reason I attempted to get on the train instead of walking back to the depot, I do anything to do my work quicker; and in daytime even the yardmaster sees you, and all the others see you; it is customary to ride on trains. On this particular occasion I had finished all my work of checking cars; I had finished checking the train; and I was going back to the depot to leave my book there, and then I was going home; that was part of the work to put the book back; I was not finished until the book was in the office. After I put up the book, I didn't have any more work to do that night. I had checked cars in the south yard. I said that when I worked at the south yard to check cars, when I went there, I would get on the switch engine and ride out. Q. Now, Joe, isn't it a fact that the only time you were authorized to get on cars and ride was when you were going out to the south yard, or coming back, or when you were checking a train of cars, and they moved the cars before you finished your checking? A. No, sir; you could ride any time; the yardmaster was around there; and, if it was not customary, I suppose he would have said so; he could have said so, I suppose; he has told me to go out to 49, and he has told me to come back, and, if the train was moving, he has told me to get on there and check it, and I had to check it, he would tell me to ride; if trains that I was checking started to move, why I would get on and go with the train to finish my checking. As to whether it is a fact that I testified on a former trial of the case that the only time I was authorized to ride trains was when I was going to or coming from the south yard, or when I was checking a train, and they moved that train before I had finished that checking, that might be the only time I was authorized to. The only time I was authorized to ride on trains was when I would go out to the south yard or come back, or when I was checking a train, checking a cut of cars, and hadn't finished my checking and they moved them, and I got on them and rode; those are the only times he told me to ride; he has told me that. The south yard is about 3½ miles south of the Congress street yard. As to whether there is any yard between the Congress street yard and the south yard, well, there are some tracks at the roundhouse; they do a little switching at the roundhouse, not much (that is, not just with engines and things like that); they have cars out there too; there are two or three tracks. The roundhouse from the Congress

street yard is about a mile, and the south yard is about 2½ miles south to the south yard, I guess. Between the Congress street yard and the roundhouse, and between the roundhouse and the south yard, as to whether they make up or break up any trains at those points, well, I don't know about that; they stop there; I know the roundhouse; I—I don't know whether they do or not between the roundhouse and the south yard. I never checked any cars between the roundhouse and the south yard, and I never checked any cars between the roundhouse and the Congress street yard. * * * This other boy, Clifford Joplin, was not hit by the switch; he was standing or leaning in the door with his feet on the running board; he was not hurt at all. * * * I was employed to work for the Houston Belt & Terminal Railway Company, and I was working in the yard of that company when I was injured, during the month of my service. In answer to a question of Mr. Burns, I said that nobody ever instructed me to ride the cars in the yards in going to and from my work; that nobody ever told me not to do it. * * * If the railroad company or any of its representatives had ever told me not to ride those cars, I would not have done it; I couldn't do the work without riding; I thought it was right to do it."

C. E. Mayfield, defendant's yardmaster at the time appellee was injured, testified: "The people employed in that yard and about it are under my supervision. I had authority to forbid any practice that I saw proper; and that applied to car checkers as well as other employés, outside of switchmen; of course that was their business. With reference to my answering Col. Jackson's questions that I didn't tell Joe to ride on passing trains or any cars switching around there going to the office after he had gotten through checking in order to deliver the books, I don't believe I did tell him not to do it. * * * I don't suppose I would know Joe Stephens if I would see him. I remember the circumstances of his being injured; I remember a young man by that name in the employ of the company. I never did give instructions to him or any one else in the Congress street yard to get on moving trains and ride from the yard up to the office. Within my knowledge, while I was yardmaster there, or while I was switchman there, it was not the custom and practice for car checkers, after finishing their work, to get on moving trains or cars and riding to the office for the purpose of leaving their book; I don't remember seeing them do it; but I suppose they did do it; I never instructed, permitted, or authorized that; my instructions did not authorize or permit it. * * * The south yard is two miles and a half from the city yard. * * * If the trains happened to be moved around at some other place in the yard, as to whether he rode those cars around, and whether it was his duty to do so, in the Congress street yard it was his duty to walk over there and tag them; he had no business on the cars when they were switching them up and down. Say he is now taking the numbers and seals on a string of cars, and the switch engine comes along and takes them—moves them entirely; moves them to another part of the yard and mixes them up with some other train or goes around to some other train—if they did that it would be his duty to go to get the seals and tag them, but— It was his duty to follow the cars; it was his duty to— They marked the cars and seals; they didn't ride the cars in doing that; I couldn't say that I never saw them ride the cars; I don't recollect seeing them ride the cars, because the tracks are close together. As to my being told that they did ride the cars after they got through checking back into the office, I was told the next morning after that young man was hurt; I was not told before that the boys did it. I was around in the yard every day; I never seen them riding cars back to the office; I see those men riding the cars; I couldn't say whether they were checkers or not. It is not a fact that I have seen those checkers riding cars and following them about for the purpose of doing that work; I didn't see them; I have seen some of them do it; of course I have. I did say I told them to ride the cars down to the lower yard for the purpose of checking and doing their work. This uptown yard is about 5 blocks long, 5 or 6 blocks, about 1,200 to 1,500 feet."

W. B. Edwards, witness for defendant, testified: "I worked for the Trinity & Brazos Valley Railroad Company, and ran over the Houston Belt & Terminal Railway Company's tracks. I held the position of brakeman with the Trinity & Brazos Valley Railway Company; I was working for that company in the year 1908. I do recall something of an accident to the plaintiff, Joe K. Stephens. I was rear brakeman on the train that the accident happened on. The train, at the time of the accident, was in the Houston Belt & Terminal Railway Company's yard and heading out north to go to Tomball, in what was known as the Congress street yard. That train had come from Galveston; it was a freight train. We stopped in the lower part of the yard and set out about half of our train; we left with 27 cars. We stopped in the Congress street yard; that was before the accident happened; and then we started out north. I was standing in the caboose door and watching ahead, and the boy that was with Stephens caught the caboose; that attracted my attention; and I looked around, I looked back, and, as I looked back, I saw the boy running to catch the caboose, and, just as he reached to catch it, he fell, he struck the switch stand and fell. I say there was another boy with him,

with the one that caught the caboose. This was a box car caboose; a box car converted into a caboose. The boy that caught the caboose was standing on the rear end of the step, on the east side, or right-hand side of the train; the train was going north; and he was standing on the right-hand side, on the running board. I saw as we were going out we were looking north, and when this boy caught on the caboose that attracted my attention and I looked around; it was not our intention to stop at the depot; we were going straight through. When the plaintiff stumbled there, I did not know at that time whether or not he had injured himself; I first learned that he had after we arrived at Belt Junction. Belt Junction, with reference to the Congress street yards, I would suppose it is about 5 miles and it is north; it is north of here; this was between 7 and 8 at night, as well as I can remember. * * * I don't remember whether the following question was propounded to me on the former trial, 'Did you think he got hurt in any way?' and that I answered, 'No, sir.' I suppose the following question was asked me on the former trial, 'You did see him fall off?' and I answered, 'I said just about the time he reached up or caught hold he hit the switch stand;' and I suppose it was true when I answered it this way. To the question asked me on the last trial, 'As well as you remember, why couldn't you remember if he was on the ground or if he was on the footboard?' I did answer, 'Just about the time he reached for the iron he fell; it happened so quick; I don't remember whether he swung onto the step or hit the switch stand and fell first;' that was true; I can't state definitely whether his foot was on the board or not on account of the fact it was done so quick; the step was not dark, the light from my lantern was on the step. I was not looking for any accident to happen, and I didn't, I said, I didn't know about it until I got up to Belt Junction."

Clifford Joplin, witness for defendant, testified: "I was employed by the Houston Belt & Terminal Railway Company; I was working for that company in September and October, 1908; I was working for the company at the time of the accident to the plaintiff, Joe K. Stephens; my position at that time was checking cars and doing calling, everything of that kind, though I was a car checker; I think that was the same kind of a position that Joe K. Stephens held. Relative to my duties and what I would have to do as a car checker, in the morning, the first thing in the morning, we would have to go out and check the yard; I believe they had three checkers at the time I was there, one for the old roundhouse, and one for the new yard, and one for the old yard; we would go out in the morning and check the yards, then come back there, and there would probably be a train or something, and they would send you out to get the numbers and seals of that. They never instructed me about riding on trains with the exception of going out to south yard; then you would probably go on a switch engine and ride out, then get off; if I was going out to the south yard, they never told me to get on; I never had any instructions as to returning to the depot after I had finished the train in the Congress street yard as to riding trains; I was never given permission by those who employed me to ride trains after I had finished checking a train in the Congress street yard on my way back to the depot. Supposing I was checking a train in the Congress street yard, and before I finished taking the numbers of the cars there and they moved the train, as to what instructions I had as to riding that train, if we could get them without getting on the train, why get them, best to get them; we were supposed to get them without getting on if we could; I don't know exactly about getting on, but you would have to get them. I don't know whether it was a month or two months that I had known Joe Stephens prior to the time of this accident; I don't remember the exact time. Joe and I had occasion at times to work together in checking cars; I think he is a little younger than I am; I will be 22 in April. My relations with Joe were friendly while I was working there; they are friendly now, on my part. I remember about the time Joe got hurt down there. At the time of his injuries, I had got through checking; I had checked a Santa Fé train, the 'Bobbie,' I believe they call it; I had finished mine, and I came over to Joe; Joe was on a Brazos Valley that had been set out, and I had finished mine and I came over to him and helped him; I had a light; Joe didn't have a light. We finished somewhere between, I don't remember, but 7 and 8 at night. While me and Joe were working there together and in checking that train and taking the numbers off of it, the one that had the book would put them down in the book; Joe had the book on that trip; I would call the numbers off to Joe and he would put them down in the book. We had finished checking the cars in that train, I had hollered the number on the last car; then me and Joe started to the depot. The depot was about 2½ or 3 blocks from the place where we were when we finished checking the train; we did not walk on down to the depot. There was a train coming, and we hopped it; I got on it, and Joe tried to get on; he grabbed at it; and he hit the switch; and I got— And I heard him halloa, and he says he broke his leg, and I hopped off and went back to him and picked him up; I didn't know how bad he was hurt; he had on black stockings, and I picked him up; he wasn't bleeding; and there was a switch engine coming back there, and I flagged it, and we brought him to the depot, and

then afterwards taken him to the infirmary in a hack. The train was going north towards the depot; it was moving between seven and eight miles an hour; I say it was a Trinity & Brazos Valley freight train; I couldn't say for sure whether it was a through train or not; it went right on through. I spoke of some Brazos Valley train Joe was checking; that was the one that came in and that was set out. That train was a different train from this Trinity & Brazos Valley train that was going out that me and Joe tried to get on."

It will be observed that it was a part of appellee's duty as a car checker to return the seal record to the office, and he attempted to board the train, from which he was thrown, for the purpose of returning to the office and depositing the book. The true question, therefore, is, Was appellee, in returning to the office, authorized to ride the train? If he did so without the consent of appellant, he was a trespasser. If he had only his master's tacit consent, he was but a mere licensee. In either event, he cannot recover. On the other hand, if he had authority from his master to ride trains moving in its yards, in the general performance of his duty, then he could recover. I concede that no express authority is shown to ride trains in the performance of his duty, except when going to or returning from what was known as the south yard and while engaged in checking cars which at the time were being switched from one portion of the yard to another. But it was not necessary to show express authority, and if he had an implied or tacit authority to ride engines and trains moving in the yards, while in the usual performance of his duties, then he was raised to a higher plane than that of a naked trespasser or mere licensee, taking the premises as he found them, and appellant would be liable to him for its negligence in maintaining the switch stand so close to the track that he was struck thereby and hurled from the train which he was attempting to board. This question of whether or not he had such authority to ride in the performance of his duty is the true criterion by which must be determined the all-important question of whether he was a trespasser or licensee; and it is of no consequence whatever that he had no specific duty to perform with reference to the train from which he was hurled, or that, in attempting to board the same, he did so voluntarily and for his own convenience; neither is it of any importance that it was a Trinity & Brazos Valley train already made up and departing for the north. The injection of these issues by appellant has ingeniously served only to obscure the true issue and divert attention from the controlling question.

In the question of authority lies the distinction between this case and the Spivey Case, cited in the majority opinion in support of the conclusion there reached that the evidence discloses appellee to have been a trespasser, or at best a mere licensee. In that case plaintiff's duties were inconsistent with the act of riding trains passing through the yards, and there was no allegation that he was authorized to ride; but it was merely averred that plaintiff and the other employés habitually rode same from one part of the yard to the other, which conduct was well known to the officers of the company. It was held that the allegations showed merely that plaintiff had been permitted to ride trains with the tacit consent of the company, and such consent, so far as riding trains was concerned, placed him upon the same level as a licensee, disconnected from the service of the company; and in riding the trains as such it was at his own risk, and he accepted the train and track in the condition in which he found them, and the company was not liable for injuries inflicted by reason of the proximity of certain scales to the track. I quote from the opinion in that case: "The petition does not allege that by his employment as call boy for the station at Commerce the plaintiff was required or expected to ride upon freight trains which might be passing through the yards, nor do the facts alleged indicate that his duties required him to ride upon such trains; on the contrary, the requirement to go to different places in the town and to different parts of the railroad yards would suggest an inconsistency between his duties and the act of riding freight trains and engines that he might find passing through defendant's yards. Upon determination of that question depends the duty of the defendant to warn him of the dangerous condition of the scales in their relation to the track. The existence and position of the scales were wholly irrelevant to the performance of his duty as call boy, unless he was called upon, in the discharge of that duty, to ride upon the cars which would pass by such scales." Railway Co. v. Spivey, 97 Tex. 143, 76 S. W. 748.

Now, in the case at bar, the position of the switch stand was not irrelevant to the performance of plaintiff's duties as a car checker, because the same at times imperatively required him to ride moving cars, and therefore the stand should have been so placed as not to be a menace to his life and limbs while so riding.

From the quotation made, it will be noted that it was held, if plaintiff was required or expected, in the performance of his duties, to ride upon the trains, a different rule would apply. I will hereafter advert to the meaning of the term "expected" as there used.

Now, in the instant case, plaintiff, under certain circumstances, viz., (a) while going to and returning from the south yard, and (b) when checking cars which at the time

were being switched about in the yards, was not only authorized but was instructed to ride engines, trains, and cars, and he and his co-car checkers rode the same habitually in going to the office. This certainly tended to enable them to perform their work more expeditiously. The employés generally in the yards rode. Mayfield, in charge of the yards, and with authority to control plaintiff in his work, saw car checkers riding trains. He was obliged to admit "that he had seen some of them doing it," and that he had never forbidden plaintiff to ride upon trains when he finished checking and was going to the office to deliver his books; and it is significant that it was not definitely shown that defendant did not expect its car checkers, in the performance of their duties, to ride cars under the circumstances that plaintiff was doing when injured. Mayfield, defendant's alter ego in the matter, said his instructions did not authorize it and he did not permit it, but he does not state his instructions forbade it, and he admitted "that he supposed that they did do it." Because he says he did not see the car checkers riding did not establish the truth of the statement. He was there where he could and must have seen them, and this would warrant a finding that he did, in fact, see them. Railway Co. v. Boozer, 70 Tex. 536, 8 S. W. 119, 8 Am. St. Rep. 615. The yardmaster expressly admits that he had not told plaintiff not to ride on passing trains; nor is there any evidence that he was otherwise advised that the riding of trains, while in the usual performance of his duties, was unauthorized. He was employed to perform certain duties, and, if not instructed, how was he to know in what manner he was authorized or expected to perform the same, except by observing and following the actions of others performing the same or similar services? This is especially true in view of his minority. Having been given no instructions upon the subject, and observing others in the performance of such duties riding trains, was not plaintiff authorized in assuming, and was not the jury authorized in finding, that defendant did expect plaintiff to ride engines, trains, and cars moving in its yards, while in the usual performance of his duties? I am therefore of the opinion that the evidence was sufficient to raise the issue of whether plaintiff was impliedly or tacitly authorized to ride upon trains while in the performance of his duties as a car checker, and that authority to ride was not limited to the two instances noted in which he had been expressly directed to ride. If this issue be resolved in his favor, as it was resolved by the jury, he was thereby raised to a plane higher than that of a licensee. That he was in the performance of his duty in returning his record to the office cannot be controverted, and under the testimony quoted above, in my judgment, the jury was authorized to find in his favor

upon the controlling question of authority.

The fourth and fifth assignments complain of portions of the court's charge set out in the majority opinion. The criticism leveled against the same is in respect to the use of the word "expect." It is urged that "expect" means to " 'look forward to (mentally); to look forward to as something that is believed to be about to happen or come'; appellant could, with all reason, have expected appellee to have ridden upon said caboose, though it was not in the line of his duty as car checker. This is plain when we remember that appellee and his co-car checker, Joplin, both testified that they habitually and customarily rode trains and cars whenever they found them going their way, and that the employés of appellant knew that they did so. If you know that a person is in the habit of doing a thing a certain way, or doing a certain thing, we naturally would expect that person to do that thing in that way; and, while it may not be the duty of the person to do it that way, yet we would naturally expect him to do so, regardless whether it was his duty or not. In short, our complaint of this charge is that it gives an erroneous basis for the recovery of appellee, and makes him entitled to recover, even though he was a mere licensee. If the undisputed evidence shows that appellee was a mere licensee and was in the habit of customarily riding on cars and trains when they were going his way, would it not follow that the court, in this paragraph of his charge, permits him to recover as a mere licensee, and does not hold him to show that he was in the performance of his duty at the time of his injury?" The foregoing quotation is from appellant's brief and presents the criticism made of the charge.

This objection is not well taken. The term "expect" was used in the charge in the sense of "authority," and the jury must have so understood it and could not have construed it in the manner as contended by appellant. It was in the sense of "authority" that the term was used in the Spivey Case. That it may properly be so used is evident, for if A. employs B. to perform a certain service, and "expects" B., in the performance of this service, to use certain instruments, then it necessarily follows that B. was "authorized" to use the same. So it is quite obvious that the jury must have understood that the term was used in this sense, and not in the sense that defendant should be held liable if it merely looked forward to plaintiff riding the train, or believed he would do so without regard to authority. The trial court in his charge used the language of Judge Brown in the Spivey Case, and the criticism made is hypercritical and without substantial merit.

The question, objection, and answer referred to in second assignment of error is: "Q. Now, in riding cars, what was your idea as

to whether it was your duty to do it or not to do it? Mr. Burns: I make the objection that that is merely an opinion of the witness. Court: I think that would be proper. Mr. Burns: Note our exception. Q. Well, what do you say? A. It was my duty. I would have to do it or I could not do the work."

In the third assignment it is: "Q. Now, when you undertook to get on this board, and while you were on it, did you consider or not consider that you were in the performance of your duty as car checker? Mr. Burns: I object to that as it calls simply for the conclusion of the witness, and is immaterial and irrelevant. Court: Under the allegations of his petition I will admit it. Mr. Burns: We will except. A. Well, I thought it was part of my duty to go from any part of the yard to the office, and from any part of the (I mean from the office to other parts of the yard) to ride on the train. (The defendant then and there objected to the witness being permitted to testify in answer to the question propounded by plaintiff's counsel that he thought it was his duty, in going from any part of the yard to the office, and from the office to other parts of the yard, to ride on trains. Defendant objected to this evidence because it called for the conclusion of the witness, and was immaterial and irrelevant, which objection was overruled by the court and said evidence admitted.) * * * "

It will be noted the majority opinion errs in stating he was permitted to testify "that it was his duty, and that he believed it to be his duty to ride cars in the performance of his duties as car checker." It would have been improper to permit him to state what his duty was, since it would necessarily have been his own deduction or conclusion as to the controlling issue in the case; but the question had reference to what was his conception of his duty. This was a proper inquiry, since, if he had understood that it was not his right to ride, that would have ended the case. He had to think he was authorized to ride, and his belief in this respect was a part of his case; as such, it was admissible. At any rate, the matter does not present reversible error. Rule 62a (149 S. W. x).

The effect of the majority opinion herein is to practically settle and dispose of the case, and, believing the views therein expressed to be erroneous, I here now enter my dissent.